Hilsinger Company v. Eyeego Hilsinger Company v. Eyeego, LLC Hilsinger Company v. Eyeego, LLC Thank you, Your Honor. I'm Tom Maltier, representing Helen's Eyeego in this case. And I think we're dealing with something similar to the first case before you today. Eyes v. Root Canals, right? Perhaps not the technology. But in our case, we have a series of patents claims that were determined by the district court not to be anticipated by the two prior art references that were before her. But that were determined to be obvious. And they were determined to be obvious despite the fact that two limitations from the claims were not met by the prior art. And the problem we have is there's really no reasoning or record evidence why anybody wouldn't be motivated to modify either of the two references. And like I said, the two limitations that aren't met are just not identified in the record evidence anywhere. And those are? The two limitations are that the first threaded portion of the screw is shorter than the second non-threaded portion. And that the screw can be aligned by pulling on the non-threaded portion from below once the screw's been inserted into the hinge barrel to bring the threads into engagement. So the way these work, and you've seen from the figures, there's a threaded first portion, there's a non-threaded second portion. When you put this into the barrel of a hinge, this non-threaded second portion for that second limitation to be met needs to be long enough to extend out the bottom of the barrel of the hinge before the threads have been engaged, before the screw's been screwed down basically. That's the second limitation that's not met. And that's to increase leverage, right? No, at that point actually, when the screw is just being screwed in, the breakaway is still within the hinge barrel. So you can screw it in with your fingers. Yes, and the reason this is important is many eyeglasses have spring hinges, these do, they spring out. And when you're putting these together, the spring hinges tend to push themselves out of alignment. It's kind of one of the side effects of putting the spring in. So if you can get the screw in, reach down and get the bottom, you don't have to reach for a second tool. You can maintain the spring hinge alignment while you pull this down and begin threading it. Then you don't have to worry about the screw popping out and struggling to find it or losing it and having to get another one. So you're saying that the limitation relating to removing by hand is not found in the prior art or anywhere in the record? Is that, I understand, to be your position? No, the breakability is one of the features of the claimed invention. The feature that I'm discussing here is a different feature. Like I said, that second portion, the lower portion of the screw would be longer than the first portion. So that you can grab the lower portion once the screw has been inserted into the barrel and twist it. Sure, so manipulating the non-threaded second portion directly by hand by a user without the use of a tool, is that the limitation you're talking about? Well, the limitation varies from claim to claim. But yeah, basically that the district court found, and I think the subtle differences in language for the purposes of this analysis really don't change much. So why doesn't the central style screw teach that limitation? The central style screw, well first of all, the two screws, the center screw and the central style screw, the district court found and Hilco agrees, Hilco being the Hilsinger company, that they're essentially identical. Excuse me. And the central style screw, the second non-threaded portion is shorter than the first threaded portion. So first of all, it just plain doesn't mean... But I was going back to that limitation that we were talking about. The one where the screw is aligned by manipulating the non-threaded second portion directly by hand by a user without the use of the tool. And by the way, I'm repeating language from Claim 26. I'm reading. And I was asking specifically why that limitation is not met by the central style screw. Okay, the reason that wouldn't be met, first of all, the central style screw does not, the central style catalog, excuse me, we don't actually have a central style screw in evidence. It's just a catalog. The catalog doesn't teach or suggest that in any way. Why isn't it in the figure? In the figure, the screw has already been completely inserted and screwed down when somebody is, and assuming that those are fingers. When that portion of the screw is being grasped, there's no indication that you can insert and align the screw before it has been screwed all the way down by grasping that lower portion. And the reason you can't is because it would be entirely within the barrel. It wouldn't be extending below the barrel at that point. Because the first threaded portion of the screw is going to effectively be the same length as the hinge barrel. So when you first put it in and the threads touch, you've got the full length of the hinge barrel above it. So if the non-threaded portion is shorter than that, it's necessarily going to be entirely contained within the hinge barrel, and you can't grab that non-threaded second portion at that point. Excuse me. So I guess there's a couple of issues that we take with the obviousness finding. The first is, like I said, two prior art references are conceded to be identical, and were found to be identical. And, excuse me, there's no teaching, there's nothing in these two prior art references that suggests a first threaded portion being shorter than a second non-threaded portion. And there's no reason why somebody skilled in the art would have taken either of these two screws and combined them together. Because first of all, they're identical screws. You combine them, you get the same identical screw. Second of all, there's no reason given why somebody would be motivated to modify it in any way, shape, or form, much less to meet these claim limitations. Why not simply to increase the amount of leverage that you could obtain by increasing the length of the breakaway section? Well, I think there's sort of two points to that. The first is, there's no indication on the record that the breakability feature was recognized in the art in any way, shape, or form as being of importance. The narrow neck of the screws in the prior art certainly suggests that that's... I mean, why would you otherwise have that narrow neck, other than to break away? It could simply provide a sort of tactile feel for when you take a pair of nibbers to nip the end off. Nibbers for doing that are... The picture of the thumb reaching there suggests that some manipulation there, which, at least to my eye, suggested the possibility of a breaking away at that point. So you're suggesting... you're referring, I should say, to the Centristyle catalog? Yes. Okay, because there is no such reference in the Hilco catalog or in the prior catalog. No, I'm talking about the prior... Again, to the extent that breakability is recognized, there's no recognition that there's any problem with the breakability or a need to improve the breakability. If the screw's breakable, there's really no reason why somebody would be modified to make a longer second portion, increase the cost, increase the amount of material they're going to. Well, okay, let me ask the question of you then. Well, what advantage does your patent have to making the second portion longer, vis-a-vis breakaway capacity? In terms of breakaway, it certainly probably does give more leverage. So wouldn't that be an incentive for someone looking at the prior act if they wanted more leverage? But at that point, you're using my client's patent as the guide map to get to, obviously. So you're using hindsight. I actually didn't need your client's patent in order to see that if you lengthen the length of the second section, you'd get more torque out of it. That's pretty basic stuff. I understand what you're saying, but I guess the response I would have is twofold. First of all, there is no record evidence that that had been a problem identified, that it was not sufficiently breakable in the record evidence. Second of all, to the extent that that was a problem that needed to be identified, Mr. Sadler, Sadler Screw was the company that initially sold Sadler Screw. They had been purchased by Hilco. So between the two of them, Sadler and Hilco sold that screw for about 10 years without making any modification whatsoever to it. And it didn't occur to them to make a modification to it until after they had seen my client's snappage screw that embodies the claims of the patent. And within months, they came out with the accused product. So this is a case where, and I know I'm now getting into secondary consideration factors, but this is a case where I think the secondary considerations tie hand-in-hand with the lack of motivation to modify the reference. The screws had existed for 10 years without anyone doing anything. They had existed in, at least in the Sadler world and in the center style world without either of those companies doing anything. My client was new to the optical industry, came up with this idea, and perhaps that's why, perhaps it was a fresh survise or a fresh look to recognize a problem that the industry itself hadn't identified or recognized. Shortly after coming up with her idea, she obtained a patent application on it. She was able to successfully license it for a considerable amount of money, upfront money and ongoing royalty, from Optisource, a company that was also selling the Sadler screw and had been doing so for years. The fact that they looked at her screw and said, wow, this is great, and we're willing to pay for a license, and the license is on the snappage screw and on the 403 patent, is substantial evidence that this is a non-obvious set of claims. Excuse me. On top of that, my client won numerous awards relating to inventiveness from people in the optical industry. Those are identified in our brief. And like I say, Hilco themselves, their copying of the screw, like I say, they had the Sadler screw for years. Within months of seeing this Tedeschi screw, they came out with a knockoff effectively. And that is, in my opinion, particularly since the prior art screw was their screw. I think that's particularly probative here, even more so than a typical copying case where the closest prior art is somebody else's. Another problem we have with the decision on obviousness, the court referred to the breakability of the screw as being the crux of the invention. And that's not actually good law. That hasn't been good law for, I don't know, 50 years. Current precedent requires that the court look at the claimed invention as a whole. And I think the court's opinion makes it clear that they discounted these two limitations that were not found in the prior art, because they determined that the, quote-unquote, crux of the invention was something else, and that they didn't need to get to that. So they effectively, they resorted to common sense, both to provide the two missing limitations and to provide the motivation to modify, to get those two limitations into the claim from the prior art. And as we stated in our brief, I believe that just stretches the case too far. And in particular, in a case like this where there are substantial secondary factors that favor non-obviousness, we really feel it pushed the case too far. Excuse me. The motivation that was provided by Hilco's expert to modify the references, excuse me, was also inappropriate. It was the test for whether something is analogous art, whether they addressed similar problems. And common subject matter approaches is the actual language that he used. They share common subject matter approaches. That's the analysis to determine whether references are analogous and thus can be considered to be relevant prior art. But it is not the test for whether something is obvious. You're well into your rebuttal. So do you want to shift gears and hear from the other side now? Okay. Thank you. Hey, Mr. Corwin. Craig Stafford, the Hilsinger Company. Hilco, I heard as an appeal the findings of anticipation, and that was the claims that have that limitation breakable by hand. And I'll get back to that in a moment when we talk about secondary considerations. But as the remaining claims on our motion for summary judgment, the court found that there were two disputed facts, which are the limitations that were discussed earlier on, as to whether there's clear and convincing evidence that the comparative length of the top portion is equal to or greater than the bottom portion, and whether a user can pull through or manipulate it by hand from underneath. So what the court did in arriving at its decision is it made a series of findings of fact, which is reviewed for clear error. One such finding of fact is that prior art can be inserted into an eyeglass hinge by hand. That's out of appendix 17. And prior art screws include a threaded portion and a non-threaded portion that are separated by a breakaway. And then with respect to the central style catalog, the district court... Let me interrupt for a second just to make sure we're all on the same page here, and I actually had to check my brief. You said findings of fact, clear error. This was a summary judgment proceeding, wasn't it? It was. Courts don't make findings of fact subject to clear error on summary judgment. The standard is, was there enough evidence of a disputed issue of material fact, which is not reviewed for clear error? Are we... That's the standard, right? Well, in reviewing an obviousness ruling, that's a de novo consideration, but underlying findings... No, there aren't findings that are made on summary judgment, right? This is... The way summary judgment works is you decide whether there are factual issues that need to be tried, and if you conclude that there aren't, that there's simply no disputed issue of material fact, then you grant summary judgment, and that's what the judge did in this case, not to make findings of fact subject to clear error. Are we on the same page here? We are, Your Honor. Okay. So prior art teaches... Well, prior art teaches whether a skilled arson would have been motivated to combine or questions of fact, and so looking at the evidence below, the court determined that the center-style catalog, looking at the center-style catalog, which was a disputed fact as to what that shows, to Your Honor's point, and the court determined that it shows that it instructed the users to snap off, not cut off or not clip off, the non-threaded portion of the center-style screw. It then determined that... It considered the testimony of Thomas Sadler and Thomas Woods, the expert, that the second smoother portion of the screw could be broken off by hand. And then the district court rejected Igoe's contention that the drawing in the center-style screw depicts pliers and not a hand, which is an argument that kind of bled into Mr. Penalty's presentation here today but is not part of an issue on appeal. And then from there, the court said... So what the court said there was there's no genuine issue of material fact on that because I can see that that's a finger and a thumb and no reasonable juror could conclude otherwise? That's correct, Your Honor. And the position below, argued by Igoe, was that that does not depict a thumb and a forefinger, that it depicts actually a set of pliers, so therefore that the crux of the invention, the breakable by hand, should survive summary judgment on 102 and over on 3. So following those determinations, the district judge said, at best, the additional limitation is a longer non-threaded portion and a screw that can be aligned by pulling on the non-threaded portion from the bottom makes slightly easier what is depicted in the center-style catalog. And that's how she got to her ruling applying KSR that without any difference in breakability without tools, there's nothing of patentable consequence here. Nothing. The district court ruled that only potential difference is the first threaded portion no longer than the second, and a screw could be aligned from below. And that is nothing of patentable consequence under the decisional law. In the reply brief, there's an argument by Igoe that the court found that the two limitations, as they call it, that are subject to the obviousness analysis, was determined by the district judge to be unrecognized in the prior art. That's kind of where they put most of their arguments. But the district judge didn't say that at all. The district judge said that it was at worst, at worst, what this patentee did was, with respect to those additional limitations, they only evidenced that the patentees recognized that a screw's breakability could be the focus of marketing. In other words, the patentee recognized the invention concept in the prior art references that were previously unrecognized. So the patentee saw something of marketing value in the prior art references and went off with that. And the court determined that in appendix 2728 that it capitalized on the inventive concept. How do we know from the prior art that the prior art references allow a user to pull the screw into the point at which it is aligned and engages the internal screw operation? I forget what you call screw ridges. Right. So we know that just by applying our concepts here that the screw has to be inserted into the hinge and you have to manipulate it to get more out of that claim. And so that's exactly what the center-style screw shows. It shows a dominant index finger from underneath the hinge manipulating that screw. Yes, but the key element, as your opposing counsel argued, was to be able to pull it to the point at which it engages with the screw threads, is the word I was looking for. Right. And so that's why it didn't go out on anticipation rails, because there was no... What's the evidence that it does that, that the prior art either does that or suggests that it can be done? Because it suggests that for the reasons we discussed earlier. Because if you can break it off by hand from underneath, then you can manipulate it. If you can manipulate it, you can turn it. And so a person of skill in the art, looking at the center-style screw, considering the expert report of Thomas Woods, which is a whole body, can see that what this claimed invention does with respect to the remaining claims is just make slightly easier, at best, or slightly more efficient, at best, what's shown in the center-style pattern. And just very briefly, secondary considerations, if I could. The suggestion of copying by Hilco is now supported in the record. Let me ask you just one more question along that line. The argument that the prior art establishes the breaking function of the lower edge and the use of the lower extension for leverage is based entirely, I guess, on the drawings showing the thumb and the finger and the thinness of the section in between the two, or is there more? There's a lot more. So I'll give you two additional references. One is Thomas Sadler himself, the guy who made the Sadler screw. And he testified that for years. He would, at trade shows, he would strip that screw and break it off underneath. Also the expert, Thomas Woods, which is uncontroverted in the record below, who testified that he not only saw Thomas Sadler at trade shows do that, but he did it himself. He was a professor of opticianry. And those are the claims. That limitation, Your Honor, those are the limitations that the district court determined were entitled to summary judgment based on 102. And those determinations have not been appealed to this court. And was there any evidence from either of those two as to the use of the bottom section to engage the threads? I believe Mr. Sadler talked about using the bottom section to manipulate. That's my guess. To manipulate, but with specificity to manipulate so as to essentially screw in the screw from the bottom. Right. So if you manipulate... Did he say that? Or words to that effect? Words to that effect. Okay. And by the way, there was not a rebuttal expert that they put up. And there was not any deposition taken of Mr. Wilksey. So very, very briefly on secondary considerations. In 2007, this patentee came to the Kilsinger Company, which is a well-established company in the industry. And she was... She had this thought of jewelry banging from the hinges of hinges. And she reached out to Kilsinger, came to his office, and said, look, I'm interested in something like this. And Kilsinger responded by saying, yeah, we're not really interested in pursuing that, but here are some screws. And he gave her some Sadler-type screws. And at that point in time, the depositions testified that she had zero experience in the optical industry.  With the Hillsborough screws given to her, she files these patents and claims that this is inventive. That's really what these patents are about. Sadler never patented these inventions. He never thought that the relative size and shape mattered or the manipulation. Was the extension of the length of the bottom section done in response to the competition? Or was it just a coincidence? Or is there any evidence of either? Yeah, there is. We have it in our response brief, Your Honor. In the 2008-2009 timeframe, the marketplace for eyewear has changed from a consumer preference perspective. And consumers changed from wire-rimmed glasses, wire-framed glasses, to plastic. With the introduction of the plastic, there were wire frames and temples that required a longer lead. So you're saying this was in response to the change in the style of glasses. Yes. And if anything, the copying goes all the way. But there's not substantial evidence of long-felt need. The marketing awards, there's no nexus in the record to the remaining claims in this case. The OptiSource license wasn't argued below. There's no... On this issue, it was an issue that I went forward understanding, but it wasn't on this issue. And long-felt need wasn't argued below either. So the district court probably said... determined that based on the strength of the obviousness case and the weakness of the secondary consideration case, that the remaining claims of the 403 patent should be invalidated under Section 103. Unless you have any further questions. Thank you. Okay, I guess I will try to take this quickly. I did this so much of my time before. Mr. Scott discussed extensively the snap-off or breakability limitation of the screws. That's not the limitation that we're asserting is not bad in the prior art, and it doesn't provide that limitation.  there's no indication of breakability of the screws. There's no indication that anyone had identified any problem with needing leverage to break off the bottom portion of the screw. The reason we know these two limitations were found not to exist in the prior art is because Hillco sought summary judgment of anticipation on the basis of these two references as to the claims at issue here. And the district court denied their motion because these two limitations are not shown to have been in the prior art. Excuse me. I would ask that you look through the record because I believe Mr. Scott was incorrect in that Mr. Sadler testified that he could hold one of these screws by hand and insert it into the hinge, but never testified that he could then reach from below, grab the non-threaded second portion and engage the threads that way. That part of this claim limitation is absent from his testimony. He also cited the expert report, which he says was unrebutted. Do you have a response to that? We did not put our own expert forward, no. But the expert likewise testified, similar to Sadler, that he could put the screw in, but not that he could reach from the bottom and grab the non-threaded second portion. And manipulate it without a tool. Excuse me. There's been no evidence in the record whatsoever that there's any recognition of the importance or added value that being able to grasp it from the bottom and manipulate it provides. There's zero evidence on the record of that. I would note also that Mr. Sadler didn't market his screw as being manipulatable, excuse me, in that fashion. He didn't market the screw, for that matter, as having a portion that could be broken off by hand. While it may have been something he did himself, this is not something that he brought to the industry and said, hey, I've got this great concept that would lead people to say, well, jeez, how can we make it more breakable? Like I said, the breakability part of this itself was not something recognized as being of importance in the field. Pilko did not market their screw that way until they came out with the accused product. And I guess finally, with respect to the recitation that Pilko gave my client, Sadler-type screws, or Sadler-like screws, I forget the exact language. The testimony is that they gave her some screws, but not that they ever gave her a Sadler screw or a center-sized screw. We don't know what screws were given. There's no description of the screws that were given. There are hundreds of thousands of different types of eyeglass screws. It could have been any of them. So I think that's just a red herring and is totally irrelevant. The one thing I would like to address on the infringement side of things, we contend that it was wrong for the court to grant summary judgment of infringement solely on the basis of finding the claims invalid. The case law that Pilko cited in the brief actually supports our point. In all of those cases, district courts dismissed infringement claims upon finding of invalidity, but they did not affirmatively find summary judgment. I don't understand how that matters. Well, if you win this case, it goes back, obviously, the infringement claim comes back into life. If you lose this case, what does it matter whether there was infringement or not? I would agree if we lose this case that it's booked. And if you win this case, it's going to go back to the district court, and she's going to decide she's going to have to deal with the infringement issue. Part of this is just to ensure that the infringement issue is not a forgotten issue and that that actually gets addressed by the court. Thank you. We thank both sides of the case.